of the United States Court of Appeals for the Fourth Circuit. Oye, oye, oye, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nine, give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. You can be seated. Mr. O'Keefe, whenever you're ready. May it please the Court? Yes, sir. My name is J.A. O'Keefe. Seated with me at council table are my co-counsel, Susan Humble and Thomas Pendarvis. Together we represent the appellants, a group of four elderly mill workers from rural South Carolina. I'd like to reserve four minutes for rebuttal. Your Honors, this is a legal malpractice and breach of fiduciary duty case. The defendants, a self-described elite group of lawyers, a joint venture at the forefront of asbestos litigation, signed up nearly 16,000 textile workers to pursue claims against asbestos bankruptcy trusts. Although they were hired to investigate, evaluate, and pursue asbestos claims against any entities who might be liable to the plaintiffs, at the time of their retention, the defendants didn't advise the plaintiffs about their rights under the South Carolina Workers' Compensation Act or the steps needed to protect those rights. During their engagement, they pursued claims against the bankruptcy trust without providing statutory notice to the plaintiffs' employers or its comp carrier. And the mill workers alleged that, as a result, the defendants caused the group of nearly 16,000 textile workers to effect an election of remedies under the Workers' Compensation Act, waiving their rights to comp coverage in favor of much smaller recoveries from the bankruptcy trusts. So they brought this lawsuit, seeking recovery and class certification. After four years of litigation, the district court denied certification and entered summary judgment in favor of the defendants, which brings us to today. The issues before the court on appeal turn largely into two core questions. First, did the district court err by ruling that the defendants were entitled to summary judgment because the plaintiffs couldn't prove their case within a case, that is, that they had a viable comp claim? And second, did the district court err by denying class certification on the sole ground that a class action was not a superior remedy to a series of thousands of trials where individual plaintiffs tried to use claim preclusion and request for admission to establish common questions of law and fact? The answer to each question is yes. Beginning with the first, the district court erred by granting summary judgment both by misinterpreting the relevant statute, South Carolina Code 421170, and by resolving disputed questions of fact against the plaintiffs. Did you ever ask the court to certify the questions of South Carolina Supreme Court? Your Honor, I don't believe either party made a formal request for certification, and subject to correction by my colleague, I think each party essentially feels that the law is settled enough to apply to these facts. We don't have any objection to certification, certainly, but we also think that the statute and the decisional law is postured such that you could apply it to these facts and get to the result where urgent. The district court essentially looked at the controlling statute, 421170, and interpreted it to mean that the plaintiffs would have to suffer disability or death within two years of their last exposure to asbestos at their employer to grant a comp claim. Since none of the mill workers had been diagnosed with asbestosis until well over two years after they stopped working, the district court reasoned they had no viable comp claim, and they couldn't prove their case within the case. They couldn't bring a legal malpractice claim. Now, the district court was wrong on the facts and wrong on the law there, and I'll take the legal point first. The relevant statute appears at page 20 of our brief, and I won't read it aloud to you, but conceptually there are a few things to note when looking at the statute. First, it's part of the Comp Act. It's well settled that it's to be liberally construed in favor of coverage. Second, no South Carolina appellate courts ever interpreted this statute. Third, no South Carolina appellate courts ever applied it to deny coverage. So what does it mean? Well, it's clear on its face that the statute involves five separate concepts. Exposure to a disease, contracting the disease, being diagnosed with the disease, being disabled by the disease, and ultimately dying. It's also clear that to a native English speaker, those are five separate, distinct concepts with distinct meanings. Exposure means the condition of being subject to an effective or influence. Contract means to acquire something, to become affected by it. And the remaining terms are pretty much self-explanatory, and disability is actually defined in the Act. But applying the plain meaning of those terms, 42-1170 says that to recover, a plaintiff has to become affected with the disease within two years. That's the interpretation of the Millworkers' Urge. It would impose, essentially, a condition precedent on recovery. And it would be a bar to claims that were just causally attenuated at the time they were brought to allow either the plaintiffs or the defendants to mount a meaningful case. It's also a test that on these facts, the millworkers could meet. Their reading was consistent with the application of the statute by the Court of Appeals, the South Carolina Court of Appeals, in Muir v. C.R. Bard, where the court looked at causation factors, the time, place, and manner of exposure to determine if the plaintiff contracted Hepatitis C within two years of his last exposure. It's also an interpretation that's finished by the South Carolina Work Compensation Commission in a number of opinions, although admittedly, and as the defendants point out, the commission hasn't been consistent in its interpretation, and the later rulings go their way. In short, the millworkers' reading of the statute is supported by the plain meaning, appellate case law, and some of the administrative decisions. Even so, the district court rejected it. It held that contracted is a term of art which means disablement or death. It relied on a pair of South Carolina Supreme Court cases and a trio of comp decisions. That was a mistake. First of all, it's just contrary to the plain meaning of the statute. What was a mistake? The court's opinion? The district court's opinion to the extent that it interpreted contract as a term of art to mean disablement or death. Aren't they getting that from Vesper's case? They're getting that from Vesper's, which in turn gets it from Glenn. Vesper says that contract is a term of art, but Vesper's is interpreting a different statute within the occupational disease section of the act. It's relying on Glenn, which actually doesn't say that at all. You're talking to the wrong people to get us to reverse the Supreme Court of South Carolina. No, no, you don't have to, though, because the Supreme Court of South Carolina in that case is talking about a different statute. And the district court said, sure, that's a different statute, but we need to interpret terms in this act consistently. But that doesn't work in 1170. Why? A few reasons. First of all, 1170 uses the terms disablement, death, and contract in the same sentence. If the General Assembly meant for them to be the same words, it would have used one word instead of three words. Additionally, the leading treatise, Beard on the Law of Workers' Compensation and Insurance in South Carolina, which has been cited favorably by the South Carolina Supreme Court, says that the term contract is not uniformly defined throughout this part of the statute. And it anticipates that courts looking to 1170 wouldn't import that meaning from Glenn and Vesper's. And third, Glenn and Vesper's were looking at the Comp Act consistent with well-settled decisional law, indicating that it's to be liberally construed in favor of coverage. And that's how they got to the result that for purposes of the other part of the act, contract was going to mean disablement or death. That was the result that got them to coverage in successor liability situations. It has really very little to do with 1170, which is a causation inquiry in conditions precedent. In relation to Justice Trach's question, when you're looking at different occupational diseases, South Carolina law does say that you tend to extrude them together and you look collectively in terms of provisions to determine the meaning of the word. So why can't we look at a different type of provision in the South Carolina law to determine what this word means here? Well, normally, Your Honor, I would agree that you could. The trouble here is that the language of this statute isn't going to let you do that. And look, the idea that you read the different parts of the statutes together is a rule of construction. What is it about the language? Is it the fact that it just didn't use that one word? No, Your Honor. The problem with this language is that the statute uses different words, disablement, death, exposure, and contract. And the district court collapses those into just two concepts, exposure and contract. But this statute is one sentence long, and the General Assembly is using those different words. If it meant that contract was the same as disabled, was the same as death, it would have used one word, whether it was contract. I mean, that's a reasonable way of putting it, but it doesn't necessarily mean that's what the General Assembly meant when they did it. I mean, sometimes, depending on the legislature, they can do it in some states to say we just said it so we can emphasize it or want to say it differently, the same thing. And the decisions you gave, the Court of Appeals decision, administrative law type decision, agency decision, none of those have any effect in terms of at least being binding in terms of what South Carolina law would be. You can look at it if you want to be persuaded by it. But these are South Carolina cases that we deal with, albeit different provisions. And so I guess to get there, we've got to accept your interpretation that this statute is just so different from the others that its meaning must be different. Well, that's one way to get there, Your Honor. Another way to get there is by recognizing that these are rules of construction. And the purpose of rules of construction is to get us to effectuate the statute in a way that gets us to the General Assembly's intent in passing it. But we know a lot about the General Assembly's intent in passing the Workers' Compensation Act, and we know a lot of that from the South Carolina Supreme Court, which tells us where to construe this provision liberally in favor of coverage. So this isn't a typical case where you're adopting, you know, you're starting from zero and interpreting just based on the plain meaning. We have the plain meaning, which we think weighs in our favor because there are different terms used throughout that section. Well, that's a totally different perspective that's going to be offered here. And Judge Spatzler started out the question by asking, did you ever ask for certification of this? And you said, no need. And yet we're faced with this, what it looks to me to be a questionable interpretation one way or the other. I'm not saying yours couldn't be reasonable, but there are other interpretations. And we're being put in a position now to come up with what we think the South Carolina Supreme Court would come up with based upon what you have given us from the Court of Appeals or from administrative agency or our own look at what we think reasonably a legislature would have done. Not that they intended, but what reasonably they would have done because they said all these other terms. Well, and we certainly – So I guess my question is, why wouldn't we ask this to be decided by the Supreme Court of South Carolina? Your Honor, if that's the court's reaction to our argument, then there's no reason why you wouldn't ask for it to be certified. Well, I'm not making a reaction. I'm asking your – I'm trying to get your input as to why that does not lead us there. Your Honor, and the reason why we didn't think certification was necessary, although we'll certainly acknowledge it's appropriate, was that given the plain terms of the statute, its use of these different words, the fact that the decisional case law the district court relied on was interpreting a different provision, we didn't think it was necessary to certify this question to the South Carolina Supreme Court. We'd certainly have no objection if the court wanted to. There's another reason why you don't need to, and that is that even accepting the district court's interpretation of that statute, it still resolved disputed questions of fact against the plaintiff. So if we adopt for purposes of argument the defense interpretation that contract means disablement or death, the district court still got it wrong because it concluded that 1170 required the mill workers to show that they contracted, that is, were disabled or died from a disease within two years of their last exposure, but then it looked at their dates of diagnosis, which is yet another separate concept, to determine that none of them could meet that test. But even on the district court's analysis, the question isn't when they were diagnosed. It's when they contracted the disease, and the mill workers had evidence, much of which is laid out in pages 28 to 31 of their brief, that they had, in fact, contracted the disease within two years of their last exposure at employment. In addition to that, they had expert testimony from Dr. William Lane that explicitly said that they'd all contracted asbestosis in the late 80s, early 90s, and that they were all disabled within two years of their exposure. Mr. O'Keefe, before you sit down, could you address the issue of lost wages? Do each of your clients have lost wages so as to be able to put forth a viable compensation claim? Yes, Your Honor, we believe that they do, but two points there. Could you explain how they do if, what, three of them are currently disabled? Isn't that correct? So how does that figure into our calculus? So two points on the lost wages. The first point is that legally they don't need to show lost wages. They can show lost settlement value of their claims to recover. And they had proof of the lost settlement value of their claims in the form of expert testimony. Right. So you're agreeing that three of the four do not have lost wages. I guess you do maintain that Larry Southern was saying he was underemployed. Larry Southern said he was underemployed, so he certainly has lost wages. On the specific question of how the other three plaintiffs show lost wages, could I return to that in rebuttal? I do want to address the settlement value point because under the law, at least as explained by the South Carolina Court of Appeals, showing a reduction in settlement value is enough to support the damages aspect of a legal malpractice claim. And the plaintiffs here did have expert testimony that they lost the settlement value of their claims. Would that be an independent basis aside from the two-year disablement part of your argument? That would be, and the disputed questions of fact would be as well. But the district court interpreted our argument as a legal argument that all claims have settlement value. And that's not what the mill workers were trying to say at all. They brought in a former South Carolina workers' comp commissioner who said that during the time at issue, a plaintiff who came forward with a physician-diagnosed claim of asbestosis who could show occupational exposure would, as a matter of fact, to a reasonable degree of legal probability, recover for that claim. And that's what they were saying. They weren't saying as a legal matter all claims have some settlement value. They were saying as a factual matter these specific claims or any claims meeting these specific characteristics in the early 2000s would generate a settlement recovery in the South Carolina comp commission. So with that, Your Honors, unless you have a question, I'd like to reserve the remainder of my time for rebuttal. Okay. Thank you. Mr. Brzezelski. May it please the Court. My name is Kurt Brzezelski, and I will also here represent the appellees in this matter. I will address the arguments that apply to all of the appellees. That is primarily the issue of the viability of the underlying claims as well as class certification. Mr. Dawes-Cook will take the last five minutes to talk about claims specific to certain appellees, specifically joint venture and personal jurisdiction issues. As Your Honors pointed out, the question of whether this should be submitted to the South Carolina Supreme Court was addressed at several of the hearings and discussed by Judge Anderson. We think Judge Anderson correctly applied existing South Carolina Supreme Court precedent that ruled that the appellants did not have a viable workers' compensation claim when they retained our clients and therefore would not have most probably prevailed on the claims as a matter of law. This is after four and a half years of litigation, and Judge Anderson heard countless arguments on this, on the summary judgment motions. And the issue about whether or not the South Carolina Supreme Court has decided that, it's very clear. In the same statute, in the same title, they have held that it is a term of art. So to suggest that it should be used with a plain meaning or something beyond that is just contrary to existing South Carolina law. When Judge Anderson first asked the question of whether we should certify it, and still believe to that, there's no necessary, it's not necessary. There are actually three cases, Glenn, Vespers, and Grice, that all follow this same analysis. And it is the analysis that is most important. But it's not the same statute. It is not the same statute, that's correct. The point the other side is making is that this statute is different from the statutes that were being analyzed under Glenn and the other cases. Absolutely. And I think if you look at when the comp commission is the administrative agency charged with applying this statute, analyzed it, and they analyzed it under the context of Vespers, they talk about the fact that, yes, it's not the same statute, but it wouldn't make sense to apply a different reading of it. In fact, in Vespers, they say our legislature could not have intended the word contracted to be synonymous with exposure. If it did so, there would be no logical purpose for enacting the statute in the first place. Your Honor, it is important to recognize that while comp statutes are to be construed in favor of coverage, that doesn't mean that there's always coverage. In fact, just looking at the comp cases, looking specifically at 42-1170, and following Vespers and Glenn, three cases, Gibson, Bishop, and Truax, all found no coverage. So if they found no coverage, and they're charged with construing it in favor of coverage, doesn't suggest that in every instance you have to follow and find coverage. What we have to understand here is that this act is very specific, and while it probably could be better written, that is the legislature's decision. In fact, in the Griffin v. Griffin case, the South Carolina Supreme Court said that you're to strictly construe statutes that are in derogation of common law. And they go on to say that the workers' compensation statute is to be strictly construed, leaving to the legislator to amend and define ambiguities. Here, we contend there's no ambiguity, that the statute is very clear as to what it requires, and as a result, the appellants in this case could not prove that they most probably would have succeeded. Your Honor's asked about the settlement value issue. Now, even if the opposing side were to win on that particular issue, does that end this case, or are there other issues that would? Not at all. Not at all. But it's one of many bases that you have. Yes, Your Honor, and I think that one of the most important bases that Judge Anderson never reached, because he didn't have to, finding that they were all going to be barred by the statute of repose, was the fact that the issue that the appellants complain of is that when our clients filed the very first trust distribution claim, that they elected a remedy under 4211-560-B. And 4211-560-B talks about filing an action at law. And if you look behind the purpose of the election of remedies rule, it's so that the employer and its insurance carrier, its cop carrier, can participate in the settlement so that they can maximize their recovery and maximize the subrogation interest. That ignores what's happening here in a trust distribution. So in 1982, when Johns Manville was starting to go under, the federal government creates this new fiction that allows asbestos manufacturers to address not only existing claims, but every future claim. And they do it in a very elaborate scheme that requires things that are completely different than either a mass tort asbestos claim, including proximate cause, or that are involved in a workers' compensation case. There is no disability required in a trust distribution claim. All that is required is that you show that you had a certain amount of exposure to a certain product within a certain time and that you have evidence of exposure. Dr. Alleyne, their own expert, testifies that you have evidence of exposure to asbestos the very moment you first breathe it in. So probably everyone in this room who's walked through an older building has some evidence in their lungs of asbestos exposure. But what's important here is... If we accept that as true, does that create an issue of fact? That everyone has asbestos exposure? If we accept his testimony as true. I think that Dr. Alleyne's testimony with regard to that is suggesting that somehow that is when you contract. And that would make no sense. That means then that there's no need for the contraction language because everyone who's ever worked in a facility would have contracted the first day they were exposed. So I don't believe it creates a material issue of fact. In fact, what Dr. Alleyne does is try to supersede the law and to overrule essentially what the South Carolina Supreme Court has said that required this disablement or death concept. Now when we look at what's going on in the trust distribution procedure, we have to remember very clearly that there's nothing... A, that there's nothing that's been lost. No election has occurred here. And two, it is incumbent upon the appellants to show, in fact, that they've lost that. That's not occurred. Nowhere in this record, in this voluminous record, is there any evidence that they, in fact, have tested this by filing the very first claim before the Workers' Compensation Commission. It's not been tested. And in fact, in our brief, we cite to several documents and cases that suggest that this is not, in fact, an action of law and no election of remedies has occurred. I don't think that it's necessary for us to get to those issues, though, because, again, under 421170, I think it's pretty clear that, in fact, they've not contracted the disease and then also that they're not disabled. Okay, that none of them are disabled and they've not lost wages. Under the Skinner case, again, South Carolina Supreme Court, it would have been fantastic if the Skinner case had gone on and addressed the second issue at hand because in Skinner, 421170 was before the South Carolina Supreme Court. But what they decided there, and it's very important as you apply the language of Vespers and Glenn and Grice to this case, is what they decided in Skinner was Mr. Skinner could not prevail because he couldn't show lost wages, i.e. he wasn't disabled. Okay, so if you're not disabled, you can't show lost wages. As Your Honor pointed out, three of these four named appellants claim that they are totally and permanently disabled for years for unrelated issues. Well, that was my question to Dr. Alleyne. He did say they were disabled within two years of disposal. Well, when he... I don't want to nuance that and say it means something else. He said it. Well, he said it when he got to the fourth try. And that is, if you look at Dr. Alleyne's... the history of Dr. Alleyne's testimony from 2012 until summary judgment was raised again in 2015, Dr. Alleyne first testifies in an affidavit that he says they're disabled in May of 2012. He says, when they came to me, they're disabled as a result of asbestosis, which is interesting because just three days... ten days earlier, when questioned in his deposition at page 210 of the record, the question was asked of Mr. Larry Southern, do you consider yourself to be disabled today? His answer, no. He wasn't disabled because when he left Springs Mills in 2007, he left not because of a disability, but because the plant shut down. And he collected unemployment benefits for a year and a half, and then he went and found a job at Snyder's Lance in Charlotte, and he testified that he never missed a day in 15 years of working at Springs, and he testified that he's never missed a day in working full-time and overtime at Snyder's Lance. So, to suggest that Dr. Alleyne creates a disability, and if you go back and look, and I think it's very important, if you look at page 10 of the appellant's reply brief, they quote from Dr. Alleyne's testimony. And in it, he says, well, when you say disabled again, we're talking about the difference between attorneys and physicians. Specifically, if someone has asbestos exposure, then that person, in my view, would be considered disabled from the viewpoint that he or she could not work in their usual occupation, and that you then run the risk of developing asbestosis and malignancies. So, what he's saying there is, from a medical perspective, I think that the first day of exposure is contracting a disability. That's what he's saying here. But an expert can't say, I'm calling it disability, when the statute and the courts define disability different. And I think that's very important in this case. I only have a few more minutes, and I want to just address very briefly the issue of the class certification, even though it was not raised by the appellants earlier. I think it's important to note that doctor, excuse me. Now, which one of you is going to address personal jurisdiction? Mr. Cook is. What's important is that, with regard to the class certification, notwithstanding Judge Anderson finding that the appellants could conceivably meet a number of the prerequisites, when you get to the ultimate issue, and that is, is a class action a better or more superior, more fairly and efficient method of adjudicating the controversy, he concludes it absolutely is not. And he concludes it very clearly and very succinctly. He says, look, this is a matter of the tail wagging the dog. What the appellants have asserted is, we have some common issues, we have 14 of them, the judge brings them down to three, correctly, I think, and says, even if you get those right, even if you decide those, you still have 15,869 individual trials. And in those individual trials, what you have to determine are very core specific issues. In fact, Judge Anderson points out very clearly that while the appellants suggest that you're deciding liability in phase one, what you're really deciding are parts of liability, because liability includes proximate cause. So what you would have if you had a class, certainly a class was within one issue, you would have to decide 15,869 times whether the plaintiff had asbestosis caused by his employment, whether the plaintiff was disabled for purposes of workers' compensation purposes, whether the plaintiff incurred lost wages, whether the plaintiff's claim was timely, and whether the plaintiff contracted asbestosis, whether they met the statute of proposed. But more importantly, Judge Anderson also recognized that with the third amended complaint filed by the plaintiffs, they added another 12 defendants. And each of those, as Mr. Cook will point out, had different relationships. Some, like Joel Bentley, sat across the table from 1,200 of these people and went through the intake procedure. Others may have, and you'd have to go through the trial to determine, may have, in fact, had prior workers' compensation claims, may have been familiar with 52-156. Just a few more seconds, but I do want to know, will your partner also address carriage liability and aspects of the joint venture? Yes, yes. This concept of giant joint venture will be handled by Mr. Cook. I think it's important to... I'll put it on you, Mr. Cook. I think it's also important to note, as Your Honor asked earlier, about the settlement value, because merely having a settlement value suggests that you should do away with, and the South Carolina Supreme Court is incorrect when it says that in order to recover on a legal malpractice case, you have to show that you most probably would have prevailed. So it most probably suggests something other than its mere settlement value. The claimants say, well, gosh, we have an expert who says every case has settlement value. Well, Your Honors, I could suggest that Bishop... He specifically refuted that statement. He said, that's not what we meant. Right. Well, and certainly Bishop, Gibson, and Truax suggest that at least three cases didn't have settlement value, and as we pointed out in our brief, at least one of the appellants' lawyers early in this case suggested that the burden of recovering for workers' comp under the Occupational Disease Act for pulmonary conditions is so high that they didn't want to pursue the claim. So not every case has settlement value. In fact, three of the named plaintiffs in this case were dismissed with prejudice, one on the eve of her deposition, two on the eve of summary judgment, with prejudice, with no settlement. Thank you. Please, the Court. I will address the issues of personal jurisdiction and joint venture and imputed liability. The District Court properly dismissed Barrett, Benton, Tullos, and Ulmer on court jurisdiction grounds. We have argued that Pittman should be included as well. His motion to dismiss was denied. A four-class certification was denied. He was held in based on four letters that he wrote to the South Carolina Three, to a lawyer, and one to a client, none of them relating to the remaining plaintiffs in this case. All of these lawyers served as local counsel, or in Benton's case, as a consultant to the lead attorneys. None practiced in South Carolina or was licensed to practice in South Carolina. They were not even associated by South Carolina lawyers, but by Georgia lawyers. They were not involved in any cases that were brought in South Carolina. If they were involved in any cases at all, they were cases that were filed in Mississippi. None of them availed themselves of the privilege of doing business in South Carolina. Plaintiffs based jurisdiction on two things. One is that the attorneys who associated them conducted activities in South Carolina. They should be imputed to these defendants. And second, that they represented people who happened to live in South Carolina. Neither of those theories is viable under precedent. In South Carolina, there are two cases by the Court of Appeals, International Mariculture Resources v. Grant and Allen v. Columbia Financial Management, in which they held that for purposes of the long-arm statute, even the acts of co-conspirators aren't imputed to their alleged co-conspirators for jurisdictional purposes. The Allen case cited the U.S. Supreme Court case of Rush v. Savchuk, a 1980 case in which the court held that the presence of the defendant's insurer, liability insurer, in the forum venue was not sufficient to, should not be imputed to him for jurisdictional purposes. And in 2014, the Supreme Court held in Walden v. Furey, quote, it is the defendant, not the plaintiff or third parties, who must create contacts with the forum state. In that case, that involved Nevada residents who were stopped at the Atlanta airport by the defendant and their cash was taken from them as alleged drug money.  Nevada, they were in the Atlanta airport, and they sought to sue the officer under Bivens' claim in Nevada, and the Supreme Court said no, that his actions occurred in Georgia, and that's where he would have to be sued. The court said, they went on to say, the mere fact that this conduct affected plaintiffs with connections in the forum state does not suffice to authorize jurisdiction. Distinguished the English and Smith case v. Metz, Fourth Circuit back in around 1990, from Virginia dealt with the situation in Oregon directly, where they did find jurisdiction. Well, we agree that it is possible to have presence in the state through an agent. If I were to retain somebody to set up business for me, get a business license for me in Virginia, I think that that would subject me to jurisdiction. So you can have imputed where the agent acts on your behalf for the specific purpose of having a presence in the state. This is not that kind of a case, and I'm going to address that a little bit when I talk about imputed liability as well. Just about all courts require the use of local counsel, and attorneys who are associated precisely because they are local attorneys or because they have specialized knowledge, as the case of the consultant, should not expect to be hailed into court in foreign jurisdictions. Your purpose as local counsel is specifically to be interfaced with the local judge and to have local knowledge and not to have a presence somewhere else where your clients happen to reside. I would add, too, that the plaintiffs claim that Pittman didn't preserve his issue under Jennings v. Stevens, and we read that case exactly the opposite, that it's an additional sustaining grounds that he should have been dismissed for lack of jurisdiction. Similar issues and policies affect the joint venture determination. The district court properly granted summary judgment as to Pittman and McCormick and partial summary judgment as to Bentley and Sims. We believe that under venture principles, they could have all gotten complete summary judgment because they were granted summary judgment because they didn't have attorney-client relationships with the plaintiffs, but under prevailing principles of joint venture law and imputed liability, none of them had the ability to control or the right to control the acts of the other members of the venture. A key requirement for negligence to be imputed to joint venturers is that there must have been an equal right to direct and control each other with respect to the common purpose, and that's a principle in South Carolina. It's also a principle in Mississippi, whichever jurisdiction's laws you might apply here. Certainly, that could not apply in cases where our clients did not even represent the plaintiffs in this case, and that's as to all of them except Bentley and Sims did appear as counsel of record in Mississippi for Harris. But even as to that case, they had no ability or right or expectation to control the conduct of the rest of the case. They were serving purely as local counsel or in some cases as a consultant. They were brought in for their local knowledge and their specific expertise. They have no right or expectation to control other aspects of the case, including client intake. And again, we all are familiar with the role of local counsel, and it would be an unprecedented expansion of the liability of local counsel and the consulting counsels to make them strictly liable for the acts or omissions of their associating counsel. So we would ask the court to affirm. Thank you, Mr. Cook. Thank you. Mr. O'Keefe. Thank you, Your Honor. I'd like to first return to the question about lost wages. Larry Southern is underemployed, so those are his lost wages. As to the remaining three bill workers... What was his evidence that he was underemployed? I know he stated that he was. Was there any other evidence to that effect? That's the only evidence I was aware of at the summary judgment stage. As to the other three plaintiffs, and also as to Larry Southern, there was evidence in the form of Dr. Lane's testimony that they were all disabled within two years of exposure. There's evidence throughout the record that they all had breathing-related issues leading up to and, in most cases, causing their unemployment, although Roy... No, I think Larry was laid off because it was closed and later found subsequent employment. But the record sites for the breathing-related disabilities for the individual plaintiffs are JA-94, 230-233, and 564-567 for Yvonne Harris. For Barbara Patterson, 583-84 and 749-50. For Larry Southern, 587, 787-88, 586, 589, 200-202. And finally, for Roy Southern, JA-219, 221, 756-64, 769, 218-220, and 756-64. On Larry Southern, was there testimony from someone in his company that he was in the highest position he could be in given his experience? Yes, Your Honor, and we think that would be a question of fact for a jury to resolve. Which of these are they going to believe? Who, at summary judgment? Summary judgment is not the place to resolve the dispute between an employee who says that he can't get a better job because he can't walk the floor, and another witness who says he's not qualified for a better job, it's not because he can't walk the floor, it's because of his education. One other point on the lost wages question is, I think that only becomes an issue because of the Skinner case, which came down, I think, in 2011. And prior to that time, pulmonary disease claimants didn't need to show lost wages. They could recover scheduled losses in the Workers' Comp Commission. In fact, Skinner is facial proof of that because it's reversing an earlier award. So if we're doing the factual inquiry of whether these claims had value in the early 2000s, that's not how the Comp Commission was approaching them. One other point about Dr. Allain is that a lot of what the defendants were arguing with respect to Dr. Allain were patently questions of fact, and arguing the weight of his testimony, or whether the fact that Larry Southern, who's not a doctor, doesn't consider himself disabled, trumps a doctor's opinion that he is disabled under these definitions of disability. Also, with regard to Dr. Allain, I did want to clarify, his opinion isn't that exposure equals contracted. I mean, his initial affidavit, pages 320 to 322, tracks the progression of asbestosis pretty carefully, and in a way that makes sense against the backdrop of 1170. 1170, as we discussed, had those five separate concepts. Dr. Allain explains that with asbestosis, you have the exposure to asbestos, which, as my colleague noted, everybody who's been in an older building has at some point, to some degree, but when exposure reaches a critical mass, the asbestos fibers start to break down in the lungs, they set off a scarring, an inflammatory process. He calls it an inflammatory cascade that's irreversible, and it's when that starts, which can be maybe within a month of critical mass exposure, that's when you contract asbestosis, but it's not diagnosable for many, many years after that. I see I'm out of time, unless the Court has any questions. Thank you for your kind attention. We'll come down and re-counsel and then go into our next case.
judges: William B. Traxler, Jr., Barbara Milano Keenan, James A. Wynn, Jr.